Mrs. David Newton **FARMER**, Appellant,

v.

Hazel F. **DODSON** et al., Appellees.

No. 15511.

Court of Civil Appeals of Texas.

Dallas.

May 15, 1959.

Rehearing Denied June 26, 1959.

Justice, Justice & Kugle, Athens, for appellant.

Mays & Jacobs, Corsicana, Willis D. Moore, Athens, for appellees.

DIXON, Chief Justice.

This is a will contest.

David Newton Farmer, 62 years of age, a resident of Henderson County, Texas, died February 10, 1957, of lung cancer after a long illness. In a holographic will dated October 20, 1955 he left all of his property, consisting chiefly of about 700 acres of land, to Dora Farmer, his surviving widow, his third wife.

This instrument was admitted to probate as a holographic will without contest, but shortly afterwards a contest was filed in the County Court by two grown daughters and two minor grandsons of testator. The two daughters and the deceased father of the two grandsons were children of the testator by his second wife. Appellees lost their contest in the County Court and appealed to the District Court.

The trial in the District Court was before a jury. Only one issue was submitted to the jury: Whether at the time David New-ton Farmer executed the purported will on October 20, 1955 he had testamentary capacity, as that term had been defined in the court's charge. The answer of the jury was that he did not have testamentary capacity. Based on the jury verdict judgment was rendered setting aside the order probating the will; and denying the application of Dora Farmer for probate of the instrument.

By way of background facts the record before us shows that the testator's first marriage did not last long and ended in divorce. His second marriage, during which his three children were born, lasted 26 years and ended finally in divorce. It was during this marriage that a good portion of his property was accumulated. His third marriage to Dora Farmer had lasted 16 years at the time of his death. No children were born of his third marriage.

His surviving widow, Dora Farmer, appellant herein, had also been married three times. Her first marriage lasted nine years and ended in divorce. Her second marriage also lasted nine years and also ended in divorce. Two children, now grown, were born of this second marriage. Her third marriage was to the testator, David Newton Farmer.

In her first two points on appeal appellant Dora Farmer alleges (1) that the trial court erred in overruling her motion for instructed verdict because the evidence adduced by appellees was insufficient to raise a fact issue; and (2) that the court erred in overruling her motion for judgment notwithstanding the verdict because (a) there was no evidence to support the verdict, and (b) the verdict was against the overwhelming weight and preponderance of the evidence.

We must overrule appellant's first two points. As we shall endeavor to show in a summary of the evidence later in this opinion, it would be incorrect for us to say that there is no evidence in the record before us in support of the jury's verdict. And it would be error as a matter of law for us to

hold that the trial court should have sustained appellant's motions for instructed verdict and judgment notwithstanding the verdict even if we were to find as a fact that the evidence was insufficient to support the verdict. We shall not pause here to discuss the difference between the "no evidence" rule and the "insufficient evidence" rule. The difference has already been discussed in several opinions by our Supreme Court, including King v. King, 150 Tex. 662, 244 S.W.2d 660; by Justice Garwood in 30 Tex.Law Review 803, for October 1952; and by the present writer in a concurring opinion in Wood v. American Security Life Ins. Co., Tex.Civ.App., 304 S.W. 2d 559, at page 565.

Appellant's third point is that the trial court erred in overruling appellant's motion for new trial because (1) there was no evidence to support the verdict and (2) the verdict was so against the overwhelming weight of the evidence as to be manifestly unjust. The nature of this point requires us to make a careful study and analysis of the evidence.

Appellant introduced twenty-three witnesses who testified in regard to the testator's mental condition. Among them were relatives, friends, neighbors, and men who had dealt with the testator in various business matters. We shall not attempt to set out a summary of the testimony of each of these witnesses. All of them gave testimony favorable to appellant's contention that David Newton Farmer was possessed of testamentary capacity when he wrote the will of October 20, 1955. Prior to his death the testator had exhibited the will to several of them and talked to them about it. There was evidence that the testator had once had a fight with his son Earl.

Dr. Louis E. Gibson, the attending physician at the time of testator's death, testified that in January 1957 prior to an operation for lung cancer, Farmer, was mentally alert and had full possession of his faculties; that he was not given any barbiturates for a week prior to the operation; that a person addicted to the use of barbiturates would manifest observable withdrawal symptoms if suddenly taken off of barbiturates, but that Farmer had exhibited no such symptoms.

Tom Evans, President of Farmers and Merchants State Bank testified that Farmer was a customer of the Bank; that in the spring of 1956 the Bank loaned him $1,000, for which Farmer executed a note; he appeared to be rational and coherent; witness did not believe there was anything wrong with Farmer's mind; the will of October 20, 1955 was wholly in the handwriting of Farmer; Farmer had talked to him about a will and the witness had shown Farmer a copy of a holographic will which witness had in his files; later Farmer returned with his own holographic will of October 20, 1955; turned it over to the witness, who kept it in his possession until Farmer's death in 1957.

The contestants, appellees here, introduced ten witnesses on whose testimony they rely mainly to support the jury's verdict that the testator lacked testamentary capacity when he wrote the will of October 20, 1955. It is to their testimony for the most part that we must look to determine whether there was sufficient evidence to support the jury's verdict. We therefore present herewith a condensed summary of the testimony of these witnesses.

R. A. Laney. Pharmacist and owner of drug store; knew Farmer many years; beginning spring of 1955 filled prescriptions for Farmer for barbiturates, first phenobarbital, later sodium seconal, purpose to produce sleep and ease pain; Farmer was uneasy about himself; witness couldn't find prescriptions; but believed on three or four occasions he sold Farmer either 30 or 40 or 100 capsules, 1½ grains each of seconal, at intervals of a month or six weeks; didn't know dosage prescribed for Farmer by his doctor; in his opinion a man fighting for his life could take 12 grains as maximum

safe dosage; Farmer was always rational and coherent.

Mattie Crowley. Sister of testator; nurse; testator was fond of his children and grandchildren, especially his crippled daughter, Hazel and her young son, who had a difficult time financially; he had the idea that Hazel drank whiskey to excess; in 1947 Farmer had an operation for stomach ulcers and had 70% of his stomach removed; suffered greatly since that time; about 2½ years before death had formed the habit of taking barbiturates; they made him irritable at times, alternating in moods between depression and elation; he died of cancer of the lungs; witness feared he would commit suicide; his wife Dora said she also feared he would kill himself and her too; in opinion of witness Farmer was of unsound mind on October 20, 1955; and did not know extent of his property, did not understand business in which he was engaged, or know natural objects of his bounty, or understand effect of his act in making will.

However, this witness, Mattie Crowley, admitted on cross-examination that as far as her personal observation was concerned, her brother never did anything to suggest to her that he was not of sound mind, other than the making of the will; she did not remember any irrational conversation with him; he knew his three children and who they were; knew what properties he owned; he was devoted to Dora who was a good wife; Dora loved him; she didn't know that he had ever had a fight with his son Earl.

Dr. Mayfield. Gave medical testimony as to effects of excessive use of barbiturates; resembles effect of alcoholic intoxication; abrupt withdrawal from use can cause convulsions and delirium; person becomes devoid of normal mental processes; unpredictable results; skin rashes may develop; he never saw or talked to Farmer; in response to very lengthy hypothetical question he answered "I would say that the man was of unsound mind;" basis of his opinion: a habitual user of barbiturates cannot be relied on.

W. L. Lightfoot. In early summer of 1955 Farmer told him of making a will dividing his property equally between his wife and children; Farmer said he wanted Earl's children to have what was coming to them out of his property; in later years Farmer was irritable; would quickly fly into a rage.

Sam Holland. Attorney, in 1945 prepared a will for Farmer leaving his property to wife and children; about three months before his death Farmer came by Holland's office and picked up the will, which had remained in Holland's possession for safe keeping.

M. T. Dodd. Farmer in later years became irritable and quick to anger; spoke of his poor health; he was "hardheaded"; seemed all right at times, other times not; showed poor judgment; he and Farmer disagreed as to how best to build a lake.

W. A. Williams. Knew Farmer since 1934, had business dealing with him; Farmer thought a lot of Earl's boys, talked of Earl and bragged about him; sick and irritable; Farmer said on several occasions that he felt like committing suicide because he "hurt all the time"; didn't make any difference what you did you couldn't get along with Farmer; sometimes went to pieces; seemed to Williams he wasn't rational because he wasn't like he used to be; he and Farmer quarreled over a business matter in 1953 and he ordered Farmer off his premises and told him not to come back anymore; after that he occasionally saw Farmer on the street, but they never talked to each other after 1953.

Hazel Dodson. Daughter; divorced; works in bank in Corsicana and supports 10 year old son; never purchased a bottle of whiskey in her life.

Bonnie Farmer. Daughter-in-law; Earl's widow; two children, sixteen and twelve years old; she is their sole support.

Cecil King. Son-in-law; husband of Bertha, daughter of testator; visited Farmer in June 1955, at which time they had a conversation about Farmer's will; Cecil, Bertha, Dora Farmer were present; Farmer read his will; it divided property in four parts, one part to Dora, other three parts to children; Farmer had stomach trouble; also cancers on his face; was in excruciating pain; in opinion of witness in October 1955 Farmer did not have sufficient mind and mentality to know value and extent of his property, the objects of his bounty, and their reasonable claim to his consideration; at certain times he was not responsible for anything; in 1955 he saw testator in a state of intoxication brought on by use of barbiturates or liquor.

However, this witness on cross-examination testified that in 1955 Farmer knew he owned several hundred acres of land; the witness never saw testator when he didn't know he owned the farm; he knew he had three children; knew he had some grandchildren; in June 1955 when he was discussing the will drawn up several years earlier, he understood the will.

 Art. 8281, Vernon's Ann.Civ.St. and Section 57 of our Probate Code, Volume 17A V.A.C.S. provide, with certain limitations, that every person of "sound mind" may make a will, but the statute does not define the term "sound mind". We must look to judicial decisions for a definition. "Sound mind" and "testamentary capacity" mean the same thing. Garcia v. Galindo, Tex.Civ.App., 189 S.W.2d 12. In order to have testamentary capacity a testator at the time he executes his will must have sufficient ability to understand the business upon which he is engaged, the effect of the act of making a will, capacity to know the objects of his bounty and their claims upon him, and the general nature and extent of his property. Nass v. Nass, Tex.Civ.App., 224 S.W.2d 280, affirmed 149 Tex. 41, 228 S.W.2d 130; McNaley v. Sealy,

Tex.Civ.App., 122 S.W.2d 330; Payne v. Chance, Tex.Civ.App., 4 S.W.2d 328.

 Courts and juries can go no further than to determine whether the testator's mental capacity measures up to the standard set by the law Though a testator may be aged, infirm, and sick he has the right to dispose of his property in any manner that he may desire if his mental ability meets the law's tests. It is not for courts, juries, relatives, or friends to say how property should be passed by will, or to rewrite a will for a testator because they do not believe he made a wise or fair distribution of his property. Bell v. Bell, Tex.Civ.App., 248 S.W.2d 978; Cruz v. Prado, Tex.Civ. App., 239 S.W.2d 650; Green v. Dickson, Tex.Civ.App., 208 S.W.2d 119; Stell v. Salters, Tex.Civ.App., 83 S.W.2d 742, 743.

Bearing in mind the above rules, we think it is plain that the record before us contains some evidence that David Newton Farmer lacked testamentary capacity when he wrote the will of October 20, 1955. Therefore we overrule that part of appellant's third point which alleges that there is no evidence to support the jury's verdict.

However we face an entirely different situation when we come to the other part of appellant's third point: that the verdict was against the overwhelming weight of the evidence. The testator's sister, Mattie Crowley, did indeed testify that in her opinion her brother on October 20, 1955 did not have sufficient mentality to understand the business in hand, the effect of his making the will, the extent of his property, or the natural objects of his bounty. But her testimony lost most of its force when she admitted on cross-examination that Farmer knew he owned the land, knew his children, knew his wife, and was devoted to her, and she to him; that she, Mattie Crowley, didn't remember any irrational conversation with him in 1955; and admitted that insofar as her personal observation is concerned, he never did anything to suggest to her that he was not of

sound mind, other than the making of the will of October 20, 1955.

The same thing may be said of the testimony of Cecil King, the testator's son-in-law. He testified that in his opinion the testator on October 20, 1955 did not know the objects of his bounty, etc. But admitted on cross-examination that Farmer knew his children, grandchildren, and wife, and knew he owned several hundred acres of land.

There is considerable testimony as to the effect of excessive use of barbiturates. However there is no testimony as to the quantity Farmer was accustomed to consume. Laney, the pharmacist, testified that he filled a doctor's prescription for Farmer three or four times and that there were intervals of a month or six weeks between purchases, but he didn't know whether the prescription called for 30, 40 or 100 capsules, or what quantities the doctor had directed Farmer to take within any given time. Dr. Mayfield testified as to the effects of excessive use of barbiturates. He never saw or talked to Farmer and did not know how much of the drug Farmer was accustomed to take. In answering a long hypothetical question the Doctor gave it as his opinion that a man who was a habitual user of barbiturates could not be relied on and was of unsound mind.

■ In our opinion the verdict of the jury that David Newton Farmer did not have testamentary capacity when he wrote the will of October 20, 1955 is so against the overwhelming weight of the evidence as to be manifestly unjust under the test laid down by our law for determining the question of testamentary capacity. Appellant's third point on appeal is sustained.

In her fourth, fifth, and sixth points appellant alleges that the court committed error (4) in permitting Dr. Mayfield to answer the hypothetical question asked him as to the mental state of the testator; and

(5 and 6) in overruling certain exceptions to the court's charge.

■ Examination discloses that these matters were not mentioned in appellant's motion for new trial. In the absence of assignments of error pertaining to them, the questions which appellant attempts to raise in her fourth, fifth and sixth points are not before us on this appeal. Rule 374, Texas Rules of Civil Procedure; Adams v. State Board of Insurance, Tex.Civ.App., 319 S.W.2d 750, 757.

The judgment is reversed and the cause remanded to the trial court for another trial.

### On Motion for Rehearing

In their motion for rehearing appellees charge that we failed to consider the record evidence as a whole but considered only a part and that part only in a light most favorable to appellant.

We have given careful consideration to the whole record. A total of 35 witnesses testified. Nine exhibits were introduced. Because of consideration of space we did not undertake in our original opinion to discuss the testimony of each of these witnesses separately or in detail. But we did discuss the testimony of ten of appellees' witnesses, as it is their testimony which must be looked to mainly in an effort to find support for the jury's verdict.

The difficulty in this case is that so far as the record shows none of the witnesses saw or talked to David Newton Farmer at the time, or approximately at the time he wrote the will in question on October 20, 1955. This is true of Mattie Crowley, Farmer's sister, and Cecil King, his son-in-law, the principal witnesses in behalf of appellees. Mrs. Crowley a resident of Grand Prairie, Texas, testified that she visited her brother six or seven times during the year 1955, but she does not say when she last saw him prior to October 20, 1955. King, a resident at various times of the

cities of Houston, Corsicana, and Wharton, Texas, testified that he visited Farmer in June 1955 and "once every three months, roughly, from that time until he died."

Appellees call our attention to several alleged facts which they assert form a proper basis for inferences in support of the jury verdict. We shall discuss some of these facts.

■ 1. Appellees say that the will was unnatural because the testator left his property to his wife to the exclusion of his grown children and his grandchildren. In our opinion the evidence is insufficient to furnish a factual basis for such an inference. Appellant and the testator had been happily married for sixteen years. Appellant had been a dutiful and loving wife. Even witnesses for appellees testified that he loved her and she loved him. She took tender care of testator through years of painful illness culminating in his death. His children had grown up, married, moved away, and established their own homes. Under our law a testator may dispose of his property as he wishes, and it is not for appellees, or the jury, or this court under the circumstances shown here, to deny him that right on the ground that it was unnatural for him to leave his property to his wife.

■ 2. Appellees assert that the very fact that this was a holographic will raises a suspicion as to the attendant circumstances. There is no merit in such an argument. A holographic will is as valid as any other will under our statute. Arts. 59 and 60, Probate Code, V.A.C.S. Such attendant circumstances as were developed in this case are not favorable to appellees' contention. Some time prior to writing this holographic will Farmer went to the office of Judge Sam Holland and picked up an earlier will which Judge Holland had prepared for him in 1945 and had retained in his files. Farmer also went to the bank where he did business, borrowed a holo-graphic will to use as a form so that he might know the proper language to use in writing a will, then later returned to the bank with his own holographic will, which he had meantime prepared, and which he left with Tom Evans, President of the Bank. We see nothing suspicious about these circumstances. They suggest rather that the testator understood very well what he was doing.

3. Appellees further allege that Farmer suffered under a delusion to the effect that one of his daughters was drinking too much and was spending too much money on liquor. We cannot say that the record definitely establishes that this was a delusion. The entire testimony of the daughter herself in regard to the matter was as follows: "Q. * * * Tell the jury please * * * if you ever purchased a bottle of whiskey in your life? A. I never have." As attorney for appellant pointed out in his oral argument this testimony merely informs us that the daughter had never purchased a bottle of whiskey; it does not inform us whether the daughter drank whiskey, or whether she drank or purchased gin, vodka, beer, or other alcoholic beverages.

4. Appellees say that we have chosen to disregard the testimony of Dr. Mayfield. We did not disregard the Doctor's testimony, but we think it is insufficient as a basis for the jury verdict. The Doctor did not know the testator—had never talked to him or seen him. His opinion that Farmer was of unsound mind on October 20, 1955 was elicited in response to a hypothetical question so lengthy that the question alone takes up more than two and a half pages in the statement of facts. We think it is appropriate to quote excerpts from the Doctor's testimony:

"Q. Doctor, on what part of that hypothetical question do you base your statement that he was of unsound mind? A. Habituation of barbiturates.

"Q. All right. It is your testimony then, that any man who takes barbiturates is per se of unsound mind, is that correct? A. I didn't say that. * * *

"Q. How much barbiturates in terms of grains per day was David Newton Farmer taking? A. I am not sure about the actual number. I understand that he was taking several of them a day.

"Q. Did Counsel here in his question say several a day? A. No, he didn't actually say that. I understand him to say that he would get from one particular druggist a hundred at the time.

"Q. I see. Now, Doctor, you don't know then whether he took them every day or not, do you? A. No, sir, I don't.

"Q. I see. And you don't know how many he took every day. A. No, sir, I don't."

We have found no evidence in the record as to the number of grains of barbiturates Farmer was taking, or over what period of time he took them. The druggist's testimony was that he filled a doctor's prescription for Farmer three or four times at intervals of a month or six weeks. He did not remember whether Farmer would purchase 30, 40 or 100 capsules at a time.

■ 5. Appellees charge that we failed to consider the fact the testator had a brother who had spent some time in a mental institution. Such fact furnishes no basis, especially in the light of other evidence, to infer that the testator was of unsound mind on October 20, 1955. There is no evidence in the record that insanity runs in testator's family.

Appellees cite other facts from which they would infer that David Newton Farmer lacked testamentary capacity on October 20, 1955. We shall not further lengthen this opinion with a discussion of each of these other instances. Suffice it to say we find ourselves unable to agree with appellees.

Appellees' motion for rehearing is overruled.