**Gillis DUKE et al., Appellants,**

v.

**Ina Beth FALK et al., Appellees.**

**No. 11784.**

Court of Civil Appeals of Texas, Austin.

Jan. 27, 1971.

Rehearing Denied Feb. 17, 1971.

**246**

Alvis & Carssow, John F. Campbell, Austin, for appellants.

Leonard L. Franklin, Alan Minter, Austin, Fred L. Blundell, Lockhart, for appellees.

O'QUINN, Justice.

This lawsuit contests a will, made by the testator when he was ninety-three years old, on the ground that the maker was without testamentary capacity.

Daisy Hughes, the testator, was a black man who, as a youth, came to Texas by

wagon from Birmingham, Alabama, in the company of Festus Hughes, a white youth, on a journey that took six months. The two Hughes boys had lived as neighbors in Alabama and on coming to Texas settled on adjoining farms at Joliet in southern Caldwell county near Lockhart. Their close friendship continued as long as both lived, the two living as neighbors, working together, and visiting back and forth in their two homes.

In September, 1965, Daisy Hughes made a will, known in probate law as a self-proving will, in the office of a Lockhart lawyer, with two witnesses, and with acknowledgments taken by a notary public as required by law. Daisy Hughes at the time of making the will and at his death did not have a living wife, child, or brothers and sisters. His only kin were numerous nieces and nephews. Under the will Daisy Hughes left all his property, which included a farm consisting of about 64 acres, to his nieces and nephews, except a tract of ten acres which he carved out of the farm and devised to Ina Beth Falk, the only daughter of his life-long friend, Festus Hughes. Daisy Hughes had known Ina Beth all of her life, and she had cooked meals for him and her father on occasion when the two men were working together. The ten-acre tract had a small producing oil well on it in which Daisy Hughes had a royalty interest that paid $48 a month.

Daisy Hughes died September 18, 1966, about a year after making his will, and after becoming 94 years of age. The will was filed for probate May 10, 1967, by Odessa Brown, the Independent Executrix named in the will. No contest of the will was filed in county court, and the will was admitted to probate May 22, 1967.

Willie Duke and Gillis Duke, who were sons of a niece of Daisy Hughes, brought suit in September, 1967, in county court to set aside the order of probate, naming the designated independent executrix and Ina Beth Falk as defendants. After trial in December, 1967, the county court denied the petition for cancellation of the will and probate order. Petitioners appealed to the district court, carrying forward two grounds for cancellation of the will and order of probate. The grounds were undue influence and lack of testamentary capacity.

Upon jury findings that Daisy Hughes, at the time he made his will, had testamentary capacity and was not under undue influence, the district judge entered judgment February 9, 1970, approving and validating the order of probate, ordering the will probated, and appointing Odessa Brown independent executrix.

From that judgment, the contestants bring this appeal under two points of error: (1) that the finding of testamentary capacity was "against the greater weight and preponderance of the evidence" and (2) that the court erred in excluding a letter to Odessa Brown from Fred C. Hughes which had been offered by contestants to impeach Odessa Brown.

The judgment of the district court will be modified, in the manner later specified, and as modified will be affirmed.

We consider first the point urged that the district court erred in not permitting contestants to impeach Odessa Brown by introduction of a letter from Fred C. Hughes to the witness.

Odessa Brown, who was related by marriage to Daisy Hughes, first was called upon to keep house and cook for the elderly man and later became guardian of his person and estate by appointment of the county court.

Appellants state, "The purpose of introducing the letter [of Fred C. Hughes] was to impeach the testimony of Odessa Brown and show that she had been greatly concerned about the matter of Daisy Hughes having been carried to Lockhart to get a will executed."

Odessa Brown testified that she heard that Daisy Hughes had made a will, after she had been appointed his guardian, and

that she notified Willie Duke, one of the contestants, who lived in Hillsboro. Duke went to Lockhart, and Odessa Brown went with Duke to see the lawyer who had prepared the guardianship papers and discussed the will with him. The lawyer advised them that until Daisy Hughes died nothing could be done about any will he might have made.

Odessa Brown was shown a copy of a letter, purportedly from Fred C. Hughes to her, in which it was indicated that Hughes learned of the will from Odessa Brown and in which he expressed some concern about the making of the will. The record shows that Fred C. Hughes, a white man living in San Antonio, was a cousin of Ina Beth (Hughes) Falk. The letter did not disclose whether Fred Hughes knew what disposition of property was made in the will. Odessa Brown testified that she had told Fred C. Hughes about hearing that Daisy Hughes had made a will.

Since Odessa Brown testified that she was so concerned about the will that she got in touch with Willie Duke at Hillsboro and then went with him to see a lawyer, and that she had also told Fred C. Hughes about the will, we find no basis for impeachment for the purpose of "showing that she had been greatly concerned about the matter." Odessa Brown freely admitted her concern. Moreover, appellants failed to identify the letter, or a copy of it, sufficiently to lay a predicate for introduction of the letter. Odessa Brown testified she had received two or three letters, from time to time, from Fred C. Hughes, and that she had shown one letter, in which the will was mentioned, to Willie Duke when he came to her home. But at no time did Odessa Brown identify the copy shown her in court as that of the letter from Fred C. Hughes mentioning the will. Fred C. Hughes was not called as a witness to identify the original letter or a copy. No proof was made that the original letter was not available.

The trial court properly excluded copy of the Hughes letter tendered for the pur-

pose of impeaching Odessa Brown, and the point of error relating to this action is overruled.

The main onset of contestants is that Daisy Hughes, because of his advanced age, did not have mental capacity to make a will in September, 1965, and that the finding of the jury to the contrary is against the great weight and preponderance of the evidence.

Appellants rely upon testimony that Daisy Hughes was "in a bad stage," having difficulty keeping up with his money, complaining about people taking his property from him, and at times being unable to recognize his own kin, the nieces and nephews.

■ In considering whether the finding by the jury that Daisy Hughes did have testamentary capacity on the date he executed the will is a finding against the great weight and preponderance of the evidence, we must weigh the evidence supporting the verdict along with other evidence in the case, including that which is contrary to the verdict. In re King's Estate, 150 Tex. 662, 244 S.W.2d 660 (1952); Harrison v. Chesshir, 159 Tex. 359, 320 S.W.2d 814 (1959).

■ It is settled that in a suit to annul the probate of a will already admitted to probate by the county court, the burden is on contestants to establish testamentary incapacity of the testator by preponderance of the evidence, the proper inquiry being the condition of the testator's mind on the day the will was executed and not whether the maker of the will was of unsound mind. Lee v. Lee, 424 S.W.2d 609 (Tex.Sup.Ct., 1968).

A witness for appellants, Pearl Hardeman, testified that after Daisy Hughes' wife died in 1960 he "got to the place he didn't remember nothing," and that on occasions when she visited him Daisy Hughes would not know her at first. "It seemed like his mind went and come," she said.

Pearl Hardeman was not related to Daisy Hughes except by marriage, her aunt having been the second wife of Uncle Daisy. Although she lived in San Antonio, Pearl Hardeman sometimes visited Uncle Daisy at Joliet and on two occasions took him to Hillsboro with her to visit Willie Duke and Pearl Hardeman's godmother. On those occasions, she testified, Daisy Hughes became confused and did not immediately recognize his home upon their return. She also testified that Uncle Daisy was not much of a cook and that after his wife's death he often let coffee pots and cooking pots "burn up" on the stove.

Odessa Brown testified regarding difficulty Uncle Daisy had remembering friends and relatives.

"Q When his relatives would come to see him, people like his nieces and nephews, would he recognize them?

"A Like I say sometimes he would. Sometimes he had so many he hadn't seen in a long time and he couldn't, you know.

"Q This was because he hadn't seen them for a long time?

"A Yes.

"Q It wasn't because he did not have the mental ability to recognize someone he had known for a long time?

"A. Sometimes he would say 'Who are you?' Sometimes he would say that and sometimes he would know"

\* \* \* \* \* \*

"Q —did he still recognize people the way he always did?

"A Sometimes.

"Q Were there times when close friends or close relatives would come to see him and he didn't recognize them?

"A Well, sometimes, you know, he would say, 'I don't remember' and again he would remember. He would say, 'Oh, I remember you now. You are so and so' whoever it would be."

When asked about the number of nieces and nephews Daisy Hughes had living at the time of his death, Willie Duke of Hillsboro testified, "Lots of nieces and nephews. Lots of them I really don't know."

It was after the death of Daisy Hughes' second wife in 1960 that Willie Duke of Hillsboro "had occasion to be around him [Uncle Daisy] more frequently."

"Q Any particular reason more after she died?

"A The main thing I was around him and I had gotten, you know, really acquainted with him. I would visit down here lots of times. I would come and I would go around him because I always felt at home with him.

"Q In 1960 he would have been about 88 years old.

"A Yes.

"Q At that time was he in fairly good physical health?

"A Fairly good at that time.

"Q Already began to show something?

"A Yes, sir. The time his wife died that is No. 1 reason I come around him right smart. He kind of seemed like he was fading away."

Odessa Brown testified that she was called to keep house and cook for Daisy Hughes and his wife shortly before his wife died in February, 1960, and was with Uncle Daisy more than anyone else from that time until his death in September, 1966. According to her testimony, Daisy Hughes around 1960 was in good health, able to drive a car, keep the yard, see about his cattle, and, she said, "He would milk sometimes." Both Willie Duke of Hillsboro and Odessa Brown testified that later Uncle Daisy was told he could not drive any longer after he had an accident.

It was after the death of Daisy Hughes' wife that he began to have trouble with people borrowing money and not paying it

back. Odessa Brown testified that Uncle Daisy complained that everytime Willie Duke "come down [from Hillsboro] he wanted to borrow money from him, and he would give it to him." Uncle Daisy had gotten "a little weaker," Odessa Brown said. "He got tired sometimes, but he still had his mind."

Odessa Brown under cross examination testified that after his wife died in 1960 Daisy Hughes was "worried naturally sometime * * * But he held up nicely. He knew what he was doing at all times." When asked whether Uncle Daisy's memory was good in his later years, Odessa Brown answered, "Yes, it was fairly good. Sometimes he would forget just like me and anybody else."

With respect to memory and ability to look after money matters, Odessa Brown testified:

"Q * * * are you saying that Uncle Daisy and his ability to be coherent and not be confused like a 65 year old man or like an 88 year old man?

"A He knew what he was doing practically at all times. You couldn't put nothing over him that he wouldn't detect it.

"Q Was someone trying to put something over him?

"A I don't know. You talked to him about something and he would tell you, 'No, I don't want to do it that way. I want to do it this way.'

"Q Moving on from the time just after his wife died and up to the period * * * down about the middle of 1965, did you notice any changes in his memory?

"A You might say, you know, maybe he forget somthing or something like that. I would say so and so and he would say 'I forgot that.' That was what he was saying, 'Oh, I remember now.'

"Q Did you notice any change in his ability to keep up with his money?

"A You couldn't fool him with his money. He knowed that. Just like I would say, 'Uncle Daisy, you have to pay so and so,' and we would go together and pay the bills. That was before I was guardian. He would want to know how much his bills was and I would tell him, and he would know how much change he was supposed to get back out of that bill."

*   *   *   *   *   *

"Q —was it also after you were guardian?

"A Yes, yes, after I was his guardian he counted his own money.

"Q Is it your testimony that he was able to look after his business?

"A Some of his business, yes.

"Q * * * What part of it was he not able to look after?

"A Well, cook for himself.

"Q We are talking about business now, Odessa.

"A Well, I don't know. He seen about some of it, you know, when he was with Mr. Field.

"Q With regard to business, what part of his business was he not able to keep up with after you were appointed guardian?

"A I don't know any.

"Q In other words, it is your testimony that he was able—

"A Yes.

"Q —to carry on business?

"A Yes. When we go pick up his check we went together. He would get the checks and he and I would go to the window together, and he would sign and I would sign under him."

The testimony of Odessa Brown regarding business Daisy Hughes looked after, "when he was with Mr. Field," apparently referred to Uncle Daisy's lease of land to a neighbor, F. L. Field.

Field testified that he leased land from Daisy Hughes, under a written lease, paying rents annually, the lease running for a three-year term. Field obtained a renewal of the lease in writing in the "latter part of '65" when he paid Uncle Daisy "for the last lease" which was due to "expire the end of that year." Field on occasions had tried to buy the land from Daisy Hughes, with the understanding that Uncle Daisy could live on the place the rest of his life. Field testified that Daisy Hughes repeatedly refused to sell, saying he was leaving the place to his nieces and nephews, and with the further explanation, "If I get the money, you know how folks are, they will be here wanting to borrow ten or a hundred dollars * * * [and] the first thing I wouldn't have no money or nothing."

Willie Duke, one of the contestants, testified that in late 1964 Uncle Daisy "was in a bad stage and he needed help," and that thereafter Odessa Brown was appointed guardian. Both Willie Duke and Odessa Brown testified that Daisy Hughes wanted someone appointed, and because Odessa Brown had been keeping house and cooking for him already, Uncle Daisy said he wanted her to be the guardian.

The record shows that Odessa Brown was appointed guardian of the person and estate of Daisy Hughes in the county court on February 10, 1965, about seven months before he made the will contested in this suit. The application for appointment of the guardian, which was filed by an attorney in Lockhart, recited that Daisy Hughes was about 90 years of age, "and due to his advanced age, his health has broken and he is physically unable to properly care for his business affairs. That due to the advanced age of * * * Daisy Hughes it is necessary that a Guardian be appointed for his Person and Estate."

The application further recited that Hughes owned about 63½ acres of land, "and receives an old age pension in the amount of $26.00 per month and an oil royalty check of approximately $48.00 per month." These properties later were listed by appraisers appointed by the court, following appointment of Odessa Brown as guardian.

In the order appointing the guardian, the county court, after stating that the application for guardianship concerned "a person for whom it is necessary that a Guardian be appointed, an adult male ninety (90) years of age," found that due notice had been given, "and that * * * Daisy Hughes has filed * * * his Waiver of Citation by personal service and made choice of Odessa Brown as Guardian of his Person and Estate * * *" The court also found that Odessa Brown was a proper person, that the court had venue, "and the rights of the Person and property will be protected by the appointment of a Guardian."

■ Appellants take the position that "as a matter of law the Court of necessity at the guardianship proceedings had to find that Daisy Hughes was a person of unsound mind." The transcript of the guardianship proceedings, which is a part of the record, does not disclose such finding by the county court. After the findings already recited, the court appointed "Odessa Brown * * * Guardian of the Person and Estate of * * * Daisy Hughes, a person for whom it is necessary that a Guardian be appointed * * *" without declaring the ward either "a person of unsound mind, an habitual drunkard, or a person for whom it is necessary to have a guardian appointed to receive funds due such person from any governmental source." Texas Probate Code, sec. 114.

We cannot say as a matter of law that the county court in such order found Daisy Hughes of unsound mind nor can we say that the court found him to be an habitual drunkard, or a person for whom a guardian was needed to receive funds from a governmental source. This Court is not called upon to pass on the regularity of the guardianship proceedings. However irregular, incomplete, or inconclusive the pro-

ceedings may have been, the proceedings went to the jury as documentary evidence. Since it had been shown that Daisy Hughes received old age pension payments each month, it is not unreasonable to assume that the jury believed that a guardian was needed for Daisy Hughes to receive funds from a governmental source, and not because he was of unsound mind.

■ Even if the guardianship proceedings had demonstrated that Daisy Hughes had been declared a person of unsound mind, being prior to and not too remote from the date of making the will, nevertheless such evidence would have no probative force except as it might tend to show his state of mind at the time of execution of the will. Haile v. Holtzclaw, 414 S.W.2d 916 (Tex.Sup.Ct.1967); Navarro v. Garcia, 172 S.W. 723 (Tex.Civ.App., San Antonio, 1915, no writ); Parr v. Parr, 207 S.W.2d 187 (Tex.Civ.App., Amarillo, 1947, writ ref. n. r. e.).

Odessa Brown testified that prior to her appointment as guardian she went to a banker and asked him not to let Daisy Hughes have money and was told that if Daisy Hughes asked for some of his money the bank would have to let him have it. After Odessa Brown was named guardian, she looked after the money, paying bills and buying necessities for Daisy Hughes. From Odessa Brown's testimony it is clear that the main problem Daisy Hughes had with money was that his kinfolk were borrowing from him. She also testified that some of his kin were buying gas and groceries and charging them to Daisy Hughes. It was her further testimony that some of his kinsmen took hogs belonging to Daisy Hughes after "they kept worrying him about them and told him he didn't have no business with them, that he was too old to fool with them." Daisy Hughes told Odessa Brown that "they worried him so he just said, 'Take the hogs and go on * * I paid $40.00 for those hogs.'" Willie Duke of Hillsboro admitted on cross examination that he "taken one little pig he [Uncle Daisy] gave me himself."

Odessa Brown testified that Daisy Hughes had complained to the "welfare man" that people would come out to his place and "take his stuff." She further testified that Daisy Hughes said people "would come and get his hogs, his chickens and things like that." Under cross examination, Odessa Brown testified she talked only to the "welfare people" about a guardian for Daisy Hughes:

"Only the welfare people. They are the ones that told me, and told me that Uncle Daisy needed somebody. He was the one that told them that somebody come in and take his stuff, and took some hogs; he paid $40.00 for them; and they took those hogs and didn't give him a penny. He said, 'They act like I don't have to live. They want to come and take everything I got.' The welfare, the worker was a man, he told Uncle Daisy you have to have somebody out there to see about your stuff, to keep them from coming and taking it. He said 'You have to have a guardian.' That is the way it was."

Odessa Brown further testified:

"Q Isn't it also true that people could take advantage of him [Uncle Daisy] very easily?

"A When they come borrow his money something like that, and that's the reason I was his guardian. That is what he was saying: some of them come and borrow his money and like that. He told me that someone would go down to the Salt Flat Grocery Store and get groceries on him, and get gas on him, and leave him all those bills to pay."

Contestants argue that "the uncontroverted testimony is that Uncle Daisy Hughes went to Hillsboro and visited Willie Duke and told him that he wanted to write a will favoring Willie Duke" and that subsequently Daisy Hughes did make a "purported will favoring Willie Duke from Hillsboro."

The record shows that Daisy Hughes, after his wife's death, was taken before a

notary public in 1960 and there signed a paper purporting to be a will in which Willie Duke, one of the contestants, and his aunt, his sister, and a cousin were named the beneficiaries, to the exclusion of all other kin.

Later, when Daisy Hughes had been in a hospital because of an injury, he suggested that the four beneficiaries under the purported will give him $5.00 each to help on the hospital bill. When they refused, Uncle Daisy went to the notary public and got the will which he then tore up. A copy of that paper, without signatures, was introduced at the trial.

Although Willie Duke of Hillsboro testified that Uncle Daisy, while on a visit in Hillsboro, told Duke he planned to make a will, Duke denied at least three times in his testimony that he knew what Uncle Daisy was going to put in the will. Duke said that Uncle Daisy " * * * didn't tell me he was going to make it to no certain person." When asked, "What did he tell you he was going to leave you when he told you he was going to draw a will?" Willie Duke replied, "He didn't tell me personally anything to me."

About two or three weeks following Uncle Daisy's visit in Hillsboro, Willie Duke, his aunt, his sister, and a female cousin who lived in Seguin, went to Lockhart and took Daisy Hughes to the home of Monica Hysaw, an undertaker, who was also a notary public, and Mrs. Hysaw prepared the purported will of 1960 which Daisy Hughes then swore to, but later destroyed because the four beneficiaries refused to help him on his hospital bill.

The will Daisy Hughes executed in September, 1965, and now contested, was written by Fred Blundell, a practicing attorney in Lockhart. The record shows that Daisy Hughes had been to Austin where he visited his life-long friend, Festus Hughes, who was then confined to a rest home, where he died in October, 1965, about a month later.

There is a conflict in the testimony as to how Daisy Hughes, who no longer drove an automobile, was taken to Lockhart on his first visit to see the lawyer. Ina Beth Falk, daughter of Festus Hughes, testified that she and her husband carried Daisy Hughes in their car from Austin to return him home, and that Uncle Daisy asked to stop at the office of Fred Blundell. Willie Duke of Luling, a nephew, bearing the same name as one of the contestants, testified that he took his Uncle Daisy in his car to Lockhart, at his uncle's request, to see the lawyer.

Fred Blundell testified that Daisy Hughes, whom he had known since 1916, appeared in his office and told him he wanted to make a will. Blundell testified that he talked to Daisy Hughes from forty minutes to an hour, some of the conversation being on general subjects, but also directed to learning what provisions Daisy Hughes wanted in the will. Blundell's secretary, who later was a witness to the will, was present during most of the interview. No other person was present.

On being told that it would take about a week to get the will ready, Daisy Hughes left to go home. Ina Beth Falk and her husband, who had waited for him at their car, then took Uncle Daisy to his home. Daisy Hughes did not discuss with them the purpose of his visit with Fred Blundell, and Mrs. Falk testified that it was several months after Daisy Hughes' death that she learned from Fred Blundell, when they met by chance in a public place in Lockhart, that she was a devisee under Uncle Daisy's will.

It is undisputed that Willie Duke of Luling took Daisy Hughes to the office of Fred Blundell about a week after the first time Duke said he had taken his uncle to the lawyer's office. Duke said that Uncle Daisy did not tell him why he was going to see the lawyer and that he did not know about the will until after Uncle Daisy died. Odessa Brown testified that Daisy Hughes refused to discuss the contents of his will,

and she did not know what was in the will until it was read to some of the kinfolk by Fred Blundell in his office, after the death of Daisy Hughes. Fred Blundell testified that as Daisy Hughes' lawyer he of course did not reveal its provisions and kept the will in a lock-box at a bank until after the testator's death.

Fred Blundell testified that Daisy Hughes in their initial conference related to him his long friendship with Festus Hughes, described his farm, and told the date he bought the farm and from whom, and said that ten acres of the place, that then had "one little oil well on it * * * making a little bit of oil" in which "he owned a part of a royalty under it," he wanted to give to Ina Beth Falk, his friend's daughter, in memory of "his old time buddy friend." The rest of his property Daisy Hughes wanted to go to "his nephews and nieces in equal parts." Daisy Hughes told Blundell that since Odessa Brown was already looking after him, because "the welfare already had her appointed to help take care of him," he wanted her named "to handle his property in the will."

Blundell testified:

"I talked to the man for a period of about 45 or 60 minutes and determined in my own mind from my knowledge of him and acquaintance before that, and from the manner in which he conducted himself there, answered the questions, and recounted prior history, he absolutely was of sound mind and knew what he was doing and knew what he wanted to do with his property; that he realized his people were his nephews and nieces, he realized that, and he realized who his old time friend was; and I determined from my conversation with him he knew absolutely what he was doing and what he wanted to do and was of perfectly sound mind."

About a week later Daisy Hughes returned to Blundell's office and after greeting the lawyer, told him he had come in to sign the will. Blundell telephoned J. Henry Martindale, county treasurer, and asked him to be a witness, along with Blundell's secretary. After reading the will slowly and carefully to Daisy Hughes, Blundell asked him if there was anything he did not understand and whether the will was the way he wanted it. Uncle Daisy replied, "It is drawn just exactly I wanted to leave my property." Blundell served as notary public for the testator and the two witnesses. After the will was executed, Daisy Hughes said he didn't have a place to keep the will and asked Blundell to "to keep the will and when he died have it put on record."

The terms testamentary capacity and sound mind in cases involving validity of a will mean the same thing. Garcia v. Galindo, 189 S.W.2d 12 (Tex.Civ.App., San Antonio, 1945, no writ). To have testamentary capacity at the time a will is executed, the testator must have enough ability to understand the business he is about, the effect of the act itself of making a will, capacity to know the objects of his bounty and their claims upon him, and the general nature and extent of his property. Farmer v. Dodson, 326 S.W.2d 57 (Tex.Civ.App., Dallas, 1959, no writ), and cases cited.

The court in Farmer v. Dodson succinctly stated the rule that:

"Courts and juries can go no further than to determine whether the testator's mental capacity measures up to the standard set by the law. Though a testator may be aged, infirm, and sick he has the right to dispose of his property in any manner that he may desire if his mental ability meets the law's tests. It is not for courts, juries, relatives, or friends to say how property should be passed by will, or to rewrite a will for a testator because they do not believe he made a wise or fair distribution of his property." 326 S.W.2d 57, 61, col. 2, and cases cited.

We have carefully examined the entire record, bearing in mind all the rules stated, and we are satisfied that the finding of the jury that Daisy Hughes had

testamentary capacity the day he executed the will of September, 1965, is supported by the evidence and that the finding is not against the great weight and preponderance of the evidence.

■ As suggested earlier, the judgment of the district court requires modification. After holding the will of Daisy Hughes a "valid and legal Will of the deceased," the court declared:

"* * * and the same is here ordered Probated as such and as so heretofore ordered by the County Court * * * and the judgment of this Court orders the same Probated as such Last Will and Testament of deceased; and Judgment is herein entered ordering the said Will Probated as said Last Will and Testament of the deceased, Daisy Hughes, and it is so ordered, adjudged and decreed by the Court, and ordering and appointing the said Odessa Brown, as Independent Executrix of and under said Will and of said Estate, as she has heretofore by said County Court * * * been so appointed and qualified as such, and that she is now the Independent Executrix of said Estate and under said Will."

Upon determination that lack of testamentary capacity was not shown, the trial court should have rendered judgment that contestants take nothing, rather than render judgment admitting the will to probate, this being a suit to set aside the probate of a will already admitted to probate. Lee v. Lee (Tex.Sup., 1968), 424 S.W.2d 609, 612, col. 1.

The judgment of the trial court is modified so as to delete the provisions substantially recited above, ordering probate of the will and appointing the independent executrix, and to substitute a rendition that contestants take nothing by their suit to set aside probate of the will ordered by the County Court of Caldwell County, Texas.

As so modified, the judgment of the district court is affirmed.

Judgment modified and, as modified, affirmed.

SHANNON, J., not sitting.