Bobby Ray STEPHEN, Appellant,

v.

Nell Ruth COLEMAN, Independent Executrix of Estate of Dewey Lee Stephen, Deceased, Appellee.

No. 17684.

Court of Civil Appeals of Texas, Forth Worth. .

Jan. 30, 1976.

Rehearing Denied March 5, 1976.

Huey P. Mitchell, Fort Worth, for appellant.

Roger M. Norman, Fort Worth, for appellee.

## OPINION

SPURLOCK, Justice.

This is a will contest case in which Nell Ruth Coleman is the proponent and Bobby Ray Stephen is the contestant. Trial was before the court and resulted in the will being admitted to probate. Findings of fact and conclusions of law were filed.

The findings of fact and a conclusion of law summarized below were each attacked on the grounds that they were erroneous because they were against the greater weight of the evidence before the court in that the testator did not have the requisite testamentary capacity when he executed the will.

The findings of fact are: (1) the application to probate complied with the law; (4) the testator was of sound mind at the time he executed his will; and (5) at the time he executed the will he did so with the formalities and solemnities, and under the circumstances required by law to make it a valid will.

The conclusion of law is: (1) that said will was entitled to be admitted to probate.

The Court will first analyze the applicable law and then summarize the evidence.

In *Lee v. Lee*, 424 S.W.2d 609 (Tex.Sup., 1968) that court held that: "The proper inquiry in a will contest on the ground of testamentary incapacity is the condition of the testator's mind on the day the will was executed. . . . (Citing authorities.)" That court further stated that the testator's mental condition on the date the will was executed may be determined from lay opinion testimony based upon the witnesses' observations of testator's conduct either prior or subsequent to the execution. That court further stated: "However, only that evidence of incompetency at other times has probative force which demonstrates that that condition persists and 'has some probability of being the same condition which obtained at the time of the wills making. * * *' 1 McCormick & Ray, Texas Law of Evidence § 896, at 675 (2d ed. 1956); Annot. 168 A.L.R. 969 (1947)."

In *Farmer v. Dodson*, 326 S.W.2d 57 (Dallas Civ.App., 1959, no writ hist.) that court stated: "Courts and juries can go no further than to determine whether the testator's mental capacity measures up to the standard set by the law. Though a testator may be aged, infirm, and sick he has the right to dispose of his property in any manner that he may desire if his mental ability meets the law's tests. It is not for courts, juries, relatives, or friends to say how property should be passed by will, or to rewrite a will for a testator because they do not believe he made a wise or fair distribution of his property. (Citing authorities.)"

■ The general rule is that when a person had been convicted on a general conviction for insanity and a guardian had been appointed for the lunatic's estate, rendered by a court of competent jurisdiction with full power in the premises, such insanity so determined to exist was presumed by law to continue until the status of such person was changed by subsequent judgment of the County Court in a proceeding authorized for that purpose under the statutes. *Bogel v. White*, 168 S.W.2d 309 (Galveston Civ. App., 1942, ref. want merit).

In *Clement v. Rainey*, 50 S.W.2d 359 (Texarkana Civ.App., 1932, ref.) that court held that one, who in a lunacy proceeding has been adjudicated to be of unsound mind, is not necessarily incompetent to make a will. That court stated: "The most that can be contended for on account of the adjudications is that they prima facie establish that the testator was not competent to make the will."

In *Prather v. McClelland*, 76 Tex. 574, 13 S.W. 543 (1890) that court stated that by the term "testamentary capacity" is meant that the person at the time of the execution of the will had sufficient mental ability to: (1) understand the business in which he was engaged (the act of making a will); (2) understand the effect of his act in making the will; (3) understand the general nature and extent of his property; (4) know his next of kin and natural objects of his bounty, and their claims upon him; and (5) collect in his mind the elements of the business to be transacted, and to hold them long enough to perceive at least their obvious relation to each other, and to be able to form a reasonable judgment as to them.

A shorter definition is more frequently used. See *Anderson v. Clingingsmith*, 369 S.W.2d 634 (Fort Worth Civ.App., 1963, ref., n. r. e.); *Farmer v. Dodson*, supra; Comment, Texas Estate Administration, State Bar of Texas (1975) Sec. 4.27 at page 204, and cases there cited.

We will now examine the entire record to determine whether or not the court's findings of fact made the basis of the judgment were against the greater weight and preponderance of the evidence so as to be manifestly unjust and unfair, and if the conclusion of law was erroneous.

The will executed by the testator is dated December 27, 1974. It is duly witnessed by three employees of the attorney who prepared the will. It is properly signed by the testator. It is a self-proving will. It contains all the information necessary and complies with the requirements of the Probate Code in all particulars. It appoints Nell Ruth Coleman, Independent Executrix. It then bequeaths to the contestant, his step-son, $10.00, and to two daughters and two sons $10.00 each. It devises and bequeaths all of the rest and residue of the estate to the testator's mother, Gracie Hodge. It provides for an independent administration of the estate.

The contestant relies upon the cross-examination of proponent's witnesses and the testimony of Dr. Ashiru, Helen Ollie, Joseph Stephen, Nell Ruth Coleman, Geoffrey Braun, Bobby Ray Stephen, Archie Campbell, Theodore Coleman, Patricia Stephen, Evelyn Hayes, Ramon C. Triggs, Sharron Elaine Stephen, and Jacqueline Shackleford, and the records of the Veteran's Administration Hospital in Dallas, and the proceedings in a guardianship which will be hereinafter referred to.

In brief summary form this evidence reflects that deceased was seeing a Fort Worth doctor who had him admitted into a hospital in Fort Worth and diagnosed his condition as a brain tumor. He was then transferred to the VA hospital in Dallas where he was given radiation and other treatments. Various witnesses who visited him in the hospital observed that at times he had difficulty in recognizing them; that he was given medication while in the hospital that blurred his mental faculty, at times he would forget names; the doctor, who had not seen the patient, testified in response to hypothetical questions that the patient was suffering from brain cancer and the common symptoms were headaches, nausea, vomiting, possible blindness, and clouding of consciousness, memory impairment, lucid intervals, and hearing problems. He did not know whether the testator suffered from any of these symptoms and effects of this disease but this is what you could expect from a person suffering from cancer of the brain; that the testator had forgotten that he had ordered his step-son to change the locks on the testator's residence; that leaving the children $10.00 each was entirely inconsistent with his lifestyle and dealing with his children; there was a

letter in the guardianship proceedings from a VA doctor stating that in his opinion the testator was "incompetent to handle his personal affairs." The same doctor, by letter of December 17, 1974, stated that because his death was unpredictable that he provided the above information because "I do not know whether or not he was mentally capable of understanding what he was doing since I did not specifically evaluate this aspect of his condition. At the request of his sister, I asked for Psychiatric Consultation to determine mental competency or incompetency, but he died before this could be obtained."

The VA hospital records reflect that the testator was first admitted to the VA hospital on September 25, 1972. At that time on VA form 10–10, in answer to question No. 10, the testator stated: "I designate the following person or persons, in the order listed, to receive possession of all my personal property left on the premises under the control of the VA after leaving such place or at the time of my death." In answer to this question he listed Gracie Hodge, his mother, this being the same person to whom he left the bulk of his estate. He also listed her address and phone number. On this admission his condition was officially listed as Cholelithiasis (removal of gallstones through a surgical procedure). At that time he was perfectly normal, was discharged from the hospital and returned home. This is significant because at a time when there was no question about his being in his right mind and being admitted to the hospital on this prior occasion for a rather simple procedure he wanted his mother to have the property indicated above.

He was readmitted to the VA hospital on October 13, 1974, and the VA records show that he attended to collecting his insurance, signed all the necessary forms and gave information concerning credit insurance so his monthly payments to creditors would be paid by insurance. The record showed he was well oriented but lethargic. By notes dictated by the doctor on December 1, 1974, the record reflects that he could go home or be attended elsewhere with the use of nursing care. On date of December 2, 1974, the record reflects he finished his radiation treatment and could be discharged. Through December the record shows that he was given codeine when his pain became severe. The rest of the time he was given a very mild sedation for mild pain called Tylenol. The records show that on December 23, 1974, he was given a 4-day Christmas pass and returned on December 27, 1974, at 1:30 P.M., at which time he was ambulatory and stated he enjoyed the Christmas pass very much. He was given no medication on that day until 11:00 P.M., when at his request, he was given a mild sedation to induce sleep. By note of January 1, 1975, it was noted that he was confused at times but was ambulatory. He died January 5, 1975.

In response to contestant's claim that he did not know his son, the contestant, evidence was adduced to show that the reason he referred to the contestant as his step-son was that the contestant was born while the testator was in military service and stationed overseas.

■ The record reflects that the contestant, on December 11, 1974, filed an application to be appointed guardian of the person and estate of testator because there was income to the ward and incoming bills that needed to be paid and that the testator was in the Veteran's Hospital and was therefore incompetent to handle his affairs. This application was granted on December 30, 1974, after being heard before the same judge who heard the application to probate the will at a subsequent time. Therefore, there was no adjudication that the testator was incompetent on the date that the will was signed. It follows then that there was no presumption that the testator did not have testamentary capacity on the date he signed the will.

■ There was nothing in the VA records to indicate that the testator was of

unsound mind. The absence of this condition (unsound mind) in the records of the hospital can be relied upon by the court as evidence and proof of the non-existence. of that condition. Art. 3737e, Sec. 3, V.A.T.S. (Business Records Act).

In summary form the evidence relied upon by the proponent on each of the five elements concerning testamentary capacity is as follows:

(1) Sufficient mental ability to understand the act in which the testator was engaged:

The testimony of Michael Kensel, attorney, that the testator came to his office on December 26, 1974, and discussed the terms of a will that he desired. On that occasion he appeared to be a person possessing average mental capacity, he told his attorney how he wanted to dispose of his property and told him the nature of his property and referred to the contestant as his step-son. He returned to the office by appointment the next day and read the will and the attorney read the will to him, that he noticed the misspelling of his mother's name and had the attorney correct it and he initialed the correction. The will was signed with all the formalities required by law; the testator came to his office unassisted and ambulatory and was perfectly coherent.

Theodore Coleman testified that the testator had discussed the will with him prior to making a will and had also discussed it with him while the testator was still in the hospital.

(2) Sufficient mental ability to understand the effect of his act in making the will:

Michael Kensel also testified to the correction in the spelling of a name as indicated above, that the testator supplied names and addresses and correctly spelled names of the beneficiaries; stated that testator did not wish to have any specific bequest except those indicated in the will and wanted the bulk of his estate to go to his mother.

Theodore Coleman also testified that the testator discussed who his heirs were, knew who they were, their names, and that he wanted his mother to have the property.

(3) Sufficient mental ability to understand the general nature and extent of his property:

The contestant, Bobby Ray Stephen, testified that the testator knew he owned a house in the Rolling Hills Addition, and its contents, and that he was buying the house from American General Investment of Houston, Texas, who had the mortgage on the house; this and an automobile is all he owned. He knew that his son, Joe, had the automobile.

W. G. Daniels testified that he visited the testator two days after Christmas and the testator told him that his son, Joe, had his automobile; the testator knew the names of the deacons in his church, and was logical in his conversation.

Gracie Hodge testified that testator, at the time of the execution of the will, did carry on a decent and logical conversation; that testator knew he owned a house and knew that he was sick. He was also distressed because the contestant had locked him out of his house and he did not have access to his house during the Christmas holidays.

Helen Ollie testified that the testator had discussed with her some back pay to which he was entitled.

Michael Kensel, attorney, testified that the testator advised him fully of what he wanted in the will and how he wanted his property disposed of. In addition thereto he requested and obtained a power of attorney so that Mrs. Coleman could tend to his business affairs while he was in the hospital.

Archie Campbell talked to testator on the 26th of December, 1974, and in response to questions by the testator about how he could obtain the keys to his house, advised him to go to the courthouse and get an attorney to help him get into his house.

Nell Ruth Coleman testified that she had an extensive discussion with the testator about how to gain access to his house; that the testator wanted a power of attorney so someone could look after his house, and have the locks changed so he would have access to his own home.

(4) Sufficient mental ability to know his next of kin and the natural objects of his bounty, and their claims upon him:

The contestant testified that his father recognized him every time he went in to see him, that he knew his children, that between Christmas, 1974, and the date of his death, he recognized his children.

W. G. Daniels testified that the testator knew his son, Joe, and that he was in the military service and had the testator's automobile, and that he knew his youngest daughter was in the Job Corps.

Testimony of like import came from Gracie Hodge, Dewey Stephen, Sr., Helen Ollie, and Michael Kensel, and Nell Ruth Coleman.

■ (5) Memory sufficient to collect in his mind the elements of the business to be transacted and to hold them long enough to perceive at least their obvious relation to each other, and to form a reasonable judgment as to them:

Michael Kensel, the attorney who prepared the will, said the testator had as much mental capacity as the average person he deals with in preparing a will. He was doing so well that I accused him of staying in the hospital under false pretenses. He showed no signs of having mental incapacity on the date the will was signed. His judgment was good and he noticed no impairment in his memory. He was mentally capable of making a will and was fully aware of what he was doing. He was not physically fit but was mentally fit. He was perfectly mentally competent to make a will and to fully appreciate what he was doing.

The record further reflects that the testator made a trip to the office of Tom Rumph, an attorney, who offices near the courthouse, in order to get him to make a will, but the office was closed because of the Christmas holidays. He then attempted to find other lawyers and then called Lowell Dushman who referred him to Michael Kensel with whom he made an appointment and who prepared the will and attended to the signing and witnessing of the will.

As indicated above the same trial judge who heard the application for the guardianship also heard the application for the probate of the will and the contest thereof.

■ It was the province of the trier of the facts to judge the credibility of the witnesses and the weight to be given their testimony, and to resolve conflicts and inconsistencies in the testimony of any one witness as well as the testimony of different witnesses or to believe one witness and disbelieve another, or to believe part of the testimony of the witness and disbelieve any other part. *Hammond v. Stricklen,* 498 S.W.2d 356 (Tyler Civ.App., 1973, ref., n. r. e.).

The Court of Civil Appeals, when affirming a case in which sufficiency of the evidence points are involved, is not required to set out the evidence pro and con on the issues. *Hammond v. Stricklen,* supra.

We have carefully considered each point of error and each is overruled.

■ We hold that the findings of fact filed by the court were not against the greater weight and preponderance of the evidence so as to be manifestly unjust and unfair. The evidence was sufficient to support such findings. The court's conclusion of law was not erroneous. The action of the trial court in admitting the will to probate was not erroneous, factually or legally.

The judgment is affirmed.